**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SCOTT and BEVERLY CANDRIAN, husband and wife, and SCOTT and BEVERLY CANDRIAN on behalf of RS INDUSTRIES, INC., an Iowa Corporation,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>RS INDUSTRIES, INC., an Iowa Corporation, PERRY HINTZE, STANLEY HINTZE, TIM HINTZE, JEFF HINTZE, TODD HINTZE, GREG HESTER, and KEVIN CONKLIN,<br><br>　　　　Defendants. | No. CIV 13-088-TUC-CKJ<br><br>**ORDER** |

Pending before the Court is Plaintiffs' Application for Preliminary Injunction. Following the Court's issuance of a Temporary Restraining Order on March 8, 2013, *see* Doc. 29, the parties submitted additional briefs regarding the issuance of a Preliminary Injunction and evidence and argument were presented to the Court on April 30 – May 2, 2013.

*Factual and Procedural Background*

RS Industries, Inc. ("RS") is the parent company and sole owner of The Ryan Group, Inc. ("Ryan"), in Davenport, Iowa, and Sun Mechanical Contracting, Inc. ("Sun"), in Tucson, Arizona.

On February 12, 2013, Plaintiffs Scott and Beverly Candrian, as husband and wife,

filed a Complaint (Doc. 1) seeking a Declaratory Judgment and an Accounting from RS. On March 1, 2013, Plaintiffs Scott and Bevery Candrian, as husband and wife and on behalf of RS Industries, Inc., filed an Amended Complaint (Doc. 5) against RS, Perry Hintze ("Hintze"), Stanley Hintze ("S. Hintze"), Tim Hintze, Jeff Hintze, Todd Hintze, Greg Hester, and Kevin Conklin ("Conklin") seeking a declaratory judgment, an order for an accounting, the appointment of a receiver, and alleging claims of *ultra vires* acts, breach of fiduciary duty, breach of covenant of good faith and fair dealing, and defamation.

Scott Candrian ("Candrian") is the founder and current CEO of Sun. Hintze has been the managing director, with the day-to-day responsibilities of Ryan, since 1987 and is the president of RS.

Following a hearing, this Court issued a Temporary Restraining Order on March 8, 2013. This matter proceeded to hearing on a requested Preliminary Injunction on April 30 – May 2, 2013.[1]

Bruce Beach ("Beach") testified that his accounting firm has issued, reviewed, and audited financial statements for RS and that he has served as a consultant to the advisory board since the merger. He testified that, although he has never seen any signed writing that modified the buy-sell agreement, an agreement was reached at an advisory board meeting that stock would be issued to new junior shareholders in exchange for modifying the buy-sell agreement; he has received information as to the valuation of stock and compensations indicating the modification has been implemented.[2] Beach opined that events occurring at RS could pose a risk of harm to Sun. Beach also testified that alleged conduct by Tom Peters ("Peters"), as stated in the hearing, would be a legitimate area of inquiry.

Candrian similarly testified as to a modification of the buy-sell agreement; Candrian

---

[1] The summary of testimony includes testimony from both the Temporary Restraining Order hearing and the Preliminary Injunction hearing.

[2] Similarly, Certified Public Accountant Christopher Linscott testified that his review of financial records indicate that the modification was adopted and implemented.

1  has received distributions and stock was issued as set forth in the modification. However,
2  Candrian testified that the board of directors did not meet to discuss/adopt the modification.[3]
3  Candrian also testified as to his belief that the conduct of Conklin and Hintze was to
4  discredit Candrian, disrupt Sun, take stock owned by Candrian and Peters, and not pay
5  Candrian money owed to him.

6  Candrian testified that, based on the unanimous consent he executed, *see* Ex. 127, how
7  the merger between Ryan and Sun had been structured, and subsequent emails, RS had two
8  directors at the time of the closing and that there has never been an agreement to increase the
9  number of directors. Candrian also testified that he first saw the unanimous consent executed
10 by Hintze and S. Hintze that established three directors on March 11, 2013. *See* Doc. 126.
11 Candrian testified as to his concerns regarding the authenticity of the Hintze unanimous
12 consent. Candrian stated that there would not have been any reason why he would have
13 agreed to the merger unless he was an equal partner and noted that Sun has generated
14 approximately 50% of the revenues for RS over the years. He further testified that, despite
15 the Hintze group having approximately 75% of the stock ownership, Hintze agreed to the 50-
16 50 control. However, Candrian also acknowledged that the buy-sell agreement, which he
17 signed, provided that nothing therein shall limit the size of the board. Second Amended
18 Complaint, Doc. 34, Ex. E.

19 Candrian opined that he believes injunctive relief is necessary to prevent interference
20 with Sun (including the firing of himself and Peters), prevent justification of actions taken
21 by the Hintzes and Conklin (including depriving Candrian of stock and modification of the
22 board of directors), and tarnishing Candrian's reputation.

23 Jennifer Kakert ("Kakert"), an accountant who has worked at RS since February 2012
24 and is currently employed by RS as its Chief Financial Officer, testified that the financial

---

[3] Beach testified there was a risk that adoption of the modification could jeopardize the Subchapter S status of RS and that it was up to the board of directors to determine whether to take that risk.

- 3 -

health of RS is very, very strong.[4]  She also testified as to what she perceived were financial/accounting errors by Candrian and Peters; however, she testified that all of the information had been included in the financial records and books.  Kakert opined that Ryan shareholders have recharacterized personal compensation since the litigation began.  In some cases, she testified, the culture of RS has been that shareholders would run personal expenses through the company.  Kakert also stated that U.S. Bank interpreted the Temporary Restraining Order to mean that RS could not access the Sun cash accounts (i.e., RS could place money from the line of credit to the accounts, but could not pull it back to repay the line of credit).  Kakert testified that, when considering both the money received and taken out, Ryan has contributed $4 million more to the net worth of RS than Sun and that only 20-25% of RS' revenues are received from Sun.  However, she also testified that, if compensation was not considered, Sun's earnings surpassed Ryan's for the time period she reviewed.  Lastly, she testified that she does not believe RS is in any jeopardy of not being bondable and that she was hopeful of maintaining a line of credit with U.S. Bank (alternatively, negotiations are occurring with Quad City Bank).[5]

Hintze testified that the unanimous consent that he signed at the time of the organization of RS appointed him and S. Hintze as directors.  Further, Hintze testified that the unanimous consent that authorized the acquisition of Sun was signed by both him and S. Hintze.  Indeed, he testified that there have been three directors for RS since the acquisition of Sun.  However, Hintze acknowledged that no document was provided to Candrian at the time of the acquisition stating that S. Hintze was a director.

Hintze also testified that the modification of the buy-sell agreement was never taken up by the board of directors, that he did not believe the modification was ever put into final

---

[4]In performing financial services for Sun, Kakert traveled to Tucson 12 times in one year, usually for three to four days.

[5]Indeed, the testimony of Joseph Dhuey, bonding agent of Lovitt & Touché, Inc., indicates that, although additional review may be necessary, the companies will continue to be bondable.

- 4 -

1  form, and that he would not have consented to a modification without the advice of counsel.
2  Hintze opined that the modification was never implemented.

3  Hintze further testified that RS never intended to dishonor the employment agreement
4  with Candrian or terminate Candrian's employment before its expired term.  Indeed, Hintze
5  testified that, regardless of how this Court may rule on the preliminary injunction, he has no
6  intention or firing Candrian before his employment contract expires.  Hintze stated that Mark
7  Kinseth ("Kinseth") has his full support as Candrian's successor.  However, Hintze testified
8  that an employment/consultant agreement between RS and Candrian following the September
9  30, 2013, expiration of the employment agreement has not been reached; further, no
10 agreement as to Candrian's role during the redemption of his stock or dollar amount for a
11 buyout for Candrian's equity in the business has been reached.

12 Hintze testified that he trusted Peters, who took care of financial matters, while Hintze
13 was responsible for the day-to-day operations on construction sites.  Hintze also testified that,
14 from approximately 2007 to 2011, he did not review financial statements, go through the
15 bills, or look at tax returns.  He also testified that, when Conklin sought to obtain records
16 which would have revealed Candrian's income, Conklin could not obtain the records from
17 Peters without Hintze's authorization; Hintze acknowledged that he trusted Peters with such
18 documentation.  Hintze testified that Peters was placed on administrative leave in February
19 2012.

20 Hintze also testified that RS does not have access to Sun's financial information and
21 that such access is needed for the bank and the operation of the company.

22 Evidence was also presented regarding contact between Jennifer Kakert and U.S.
23 Bank, contact between Candrian and U.S. Bank, and the filing of this lawsuit and how that
24 may have affected RS' standing with U.S. Bank.

25 Candrian and Kakert disputed whether Kakert had ever been denied information from
26 Sun.  Candrian testified that information was available to RS and Kakert.  Additionally,
27 Candrian testified that he did not object to a forensic audit of Sun.

28

- 5 -

*Preliminary Injunction Standard*

As the Court previously stated, "[t]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803 (1982). The standard for issuing a TRO is the same as that for issuing a preliminary injunction. *See Brown Jordan Int'l, Inc. v. The Mind's Eye Interiors, Inc.*, 236 F.Supp.2d 1152, 1154 (D.Haw. 2007). Because a preliminary injunction is an extraordinary remedy, the moving party must carry its burden of persuasion by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865 (1997); *City of Angoon v. Marsh*, 749 F.2d 1413 (9th Cir. 1984). To obtain injunctive relief, a moving party must show either "(a) probable success on the merits combined with the possibility of irreparable injury or (b) that [it] has raised serious questions going to the merits, and that the balance of hardships tips sharply in [its] favor." *Bernhardt v. Los Angeles County*, 339 F.3d 920, 925 (9th Cir.2003). The Ninth Circuit has explained that "these two alternatives represent 'extremes of a single continuum,' rather than two separate tests. Thus, the greater the relative hardship to the moving party, the less probability of success must be shown." *Immigrant Assistant Project of Los Angeles County Fed'n of Labor (AFLCIO) v. INS*, 306 F.3d 842, 873 (9th Cir.2002), citation omitted.

*Likelihood of Success*

Only a reasonable probability of success, not an overwhelming likelihood, is all that need be shown for preliminary injunctive relief. *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991). In this case, the parties dispute whether the buy-sell agreement was modified. They further dispute whether there were two or three members of the board of directors. "Whether a contract has been modified by the parties thereto is ordinarily a question of fact for the trier of fact, as where the evidence is conflicting or the terms of the agreement are equivocal or uncertain. However, it is for the court to say whether certain letters passing between the parties constitute a modification of an existing contract between them." 17A Am. Jur. 2d Contracts § 510. Ultimately, this Court may determine whether the

- 6 -

1 conduct constituted a modification of the agreement.  While it appears that some conduct
2 indicates that the modification may have been implemented (i.e., a possible likelihood of
3 success), other factors (e.g., the intent of Hintze, failure to adopt in writing) weigh against
4 a likelihood of success.  Similarly, the lack of notice to Candrian of the Hintze unanimous
5 consent regarding the directors indicates that Defendants may be estopped from asserting
6 there were three directors (i.e., a possible likelihood of success) must be weighed against the
7 written documents and intent of Defendants.  Further, the parties have not yet had an
8 opportunity to brief whether these issues are for the jury or the Court to determine; indeed,
9 they have not yet conducted any discovery.  The parties have each presented credible
10 evidence and arguments to support their positions.  In light of the presentation of the
11 evidence, the Court can only state at this stage of the litigation that there is some probability
12 that Plaintiffs will be successful in their claims.

*Irreparable Injury*

15 The issuance of a preliminary injunction is only appropriate "when the moving party
16 has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of
17 the injury." *Simula, Inc. V. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999).  Additionally,
18 Plaintiff must "demonstrate immediate threatened harm." *Caribbean Marine Serv. Co. v.*
19 *Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  Moreover, where requested injunctive relief
20 is based on past wrongs, a plaintiff must show there is a real and immediate threat he or she
21 will be wronged again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665
22 (1983).

23 Although the Court has determined that Plaintiffs have shown some probability of
24 success, the Court does not find that a significant showing has been made.  Therefore, a
25 sliding scale requires a higher degree of irreparable harm be shown. *See e.g. United States*
26 *v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174, 175 (9th Cir. 1987).  The concerns
27 the Court expressed in issuing the Temporary Restraining Order have been alleviated by the
28 testimony presented at the Preliminary Injunction hearing.  The testimony establishes that the

1 companies will be able to continue to be bondable and maintain a line of credit. Included 2 within this consideration is that Candrian does not object to a forensic audit of Sun. Further, 3 Hintze has agreed that Candrian's employment will not be terminated prior to the expiration 4 of the employment contract and his testimony indicates that discussions for future consulting 5 are ongoing. Additionally, the parties agree that Kinseth will be Candrian's successor. The 6 testimony establishes the strong financial health of RS and Sun and that all parties are 7 interested in the continuing success of the companies.

8 The dispute between the parties is a contract dispute which may be remedied by 9 money damages. Economic damages are not traditionally considered irreparable because the 10 injury can later be remedied by a damage award. *Cal. Pharmacists Ass'n v. Maxwell Jolly*, 11 563 F.3d 847, 852 (9th Cir.2009), *modified on other grounds*, *quoting Sampson v. Murray*, 12 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). Although there may be some 13 likelihood of success by Candrian in this lawsuit, the Court finds that no *irreparable* harm 14 will result if a Preliminary Injunction is not issued. Rather, any injuries related to the 15 allegations in the Amended Complaint can be remedied by a damages award.

*Balance of Hardships*

18 Candrian argues that injunctive relief is necessary to effectively operate Sun while 19 Hintze argues that access to Sun (i.e., a lifting of the Temporary Restraining Order) is 20 necessary to effectively operate RS. The Court does not find that the balance of hardships 21 favors either side.

*Public Interest*

24 Although Plaintiffs have argued that there is public interest in issuing injunctions to 25 maintain the status quo for claims of accounting and dissolution of partnerships, this factor 26 is neutral because any injunction would be narrow and only affect the parties and their 27 affiliates. *Shepard v. Patel*, 2012 WL 6019036 *5 (D.Ariz. 2012).

- 8 -

*Conclusion*

After considering that Plaintiffs have some likelihood of success on the merits, the lack of irreparable harm, and the neutral balancing of hardships and public interest, the Court finds it appropriate to deny the request for a Preliminary Injunction and to dissolve the Temporary Restraining Order.

Accordingly, IT IS ORDERED:

1. Plaintiffs' Application for Preliminary Injunction (Doc. 7) is DENIED.
2. The March 8, 2013 Temporary Restraining Order (Doc. 29) is DISSOLVED.

DATED this 21st day of May, 2013.

*Cindy K. Jorgenson*
Cindy K. Jorgenson
United States District Judge